Filed 6/27/16  P. v. Holmes CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B263891 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA432778) |
| MONTY HOLMES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Karla D. Kerlin, Judge.  Affirmed as Modified.

Linn Davis and David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Monty Holmes appeals a conviction for resisting an executive officer and vandalism. He maintains that, in violation of his constitutional right to testify and present a defense, the trial court erred in ruling certain evidence admissible for impeachment, forcing him not to testify. Defendant also contends that the trial court erred when it computed his presentence conduct and custody credits. We conclude that the latter contention has merit and remand the action to the superior court to recalculate defendant's presentence credits. In all other respects we find no error, and affirm.

## PROCEDURAL BACKGROUND

A jury convicted defendant of one count of resisting an executive officer (Pen. Code,[1] § 69), and one count of vandalism over $400 (§ 594, subd. (a)). Defendant was also charged with and later admitted a prior conviction for first degree burglary (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).

Defendant was sentenced to 32 months in state prison (the same low term of 16 months, doubled as to each count, to run concurrently). He was ordered to pay various fines and fees and awarded 113 days of presentence custody credits, calculated at 15 percent under section 2933.1.

## FACTUAL BACKGROUND

*Prosecution Evidence*

On January 9, 2015, Los Angeles Police Detectives Horton and Gagely were assigned to the 77th Division to investigate crimes such as burglary, theft and vandalism. At about 8:15 a.m. that day, the detectives met with Virginia Maple

---

[1] Further unspecified statutory references are to the Penal Code.

and her brother, Willie Lloyd, who came into the station to report a burglary at their mother's home at 805 East 83rd Street in Los Angeles. They said this was the second burglary of the home within several months, and provided an incident report number for an August 2014 burglary which had been reported by their sister, Mary Bolden. Maple and Lloyd said both crimes had been committed by defendant, whom Maple refers to as her nephew (although he is her niece's son).

The incident report of the August 2014 burglary revealed that Bolden told the police that her nephew (defendant) had forced entry into the house by prying open metal security bars. He had since changed the locks and was living in the house without permission. An officer had gone to the home and verified that metal security bars had been pried open and that the bars of a window had been broken in order to gain entry to the residence. Maple and Lloyd identified defendant from a prior booking photo Detective Horton located at the station. They showed the officers documents indicating they had the right to control the property, and asked the officers to remove defendant from their mother's home.

At approximately 9:30 that morning, Detectives Horton and Gagely arrived at the residence on East 83rd Street in an unmarked car. They parked across the street to observe the area. A car pulled into the driveway of the residence. Defendant got out on the passenger side, opened an iron gate, walked down the driveway and disappeared. The driver remained in the car. Defendant entered the house through a side or rear door and emerged from the residence about five minutes later out the front door, which he secured behind him. He walked down the front stairs, and stopped in the yard to pet a pit bull dog.

Believing he was a burglary suspect, the detectives got out of their car and approached defendant to detain him. Detective Horton drew his gun and ordered defendant to lie down with his hands behind his head. The detective did so for

3

several safety-related reasons: (1) defendant was separated from him by an iron gate, (2) the gate interfered with the detective's ability to see the front of the house, (3) the house had not been cleared of other people or potential threats, (4) the driver remained in the car in the driveway, (5) there was a pit bull within arm's reach in the front yard, and (6) defendant was a burglary suspect.

The detectives identified themselves as police officers and displayed their badges, but defendant repeatedly refused to obey this order to lie on the ground. He said: "No. I didn't do anything wrong. Why are you stopping me?" After "a significant amount of time," defendant finally got on the ground but continued to refuse to put his hands behind his back or over his head. The detectives summoned backup who were informed they were dealing with a burglary suspect. Backup officers arrived, placed defendant in handcuffs and escorted him outside the gate.

By this time, a hostile crowd had begun forming and was growing; threatening words were directed at the officers. Additional backup was summoned. Officers Callian and Aranda responded and were instructed to get defendant into a patrol car and immediately remove him from the area. Once he had turned custody of defendant over to officers Callian and Aranda, Detective Horton—assisted by numerous other officers, supervisors and a police helicopter—turned his attention to crowd control, concerned for his and other officers' safety.

Officers Callian, Aranda and another officer escorted defendant, in handcuffs, to a patrol car. As they approached the car, defendant asked to speak to his "granny," but was told "no." He resisted being put into the patrol car and struggled to get away, so the officers took him to the ground; one hobbled his legs to secure them. Officer Callian activated an internal recorder to record video and audio of what occurred in the backseat of the patrol car.

4

Officers Callian, Aranda and others continued to struggle with defendant, trying to get him into the patrol car. Defendant continued to resist for some 10-to-15 minutes. The police were unable to get him into the car, even though officers pushed and pulled from opposite sides of the car. Defendant kept locking his legs around the patrol car door. Throughout this time the crowd began to surround the officers and defendant, who remained uncooperative. Officer Callian wanted to get defendant into the car, get him out of the area and de-escalate an increasingly hostile crowd situation. She determined the only options were to tase defendant or to use pepper spray, and that pepper spray would be a lesser use of force.

Officer Aranda sprayed defendant's face with pepper spray because he continued to refuse to get into the patrol car. Eventually, the officers were able to get him into the back seat of the patrol car and quickly drove away. They had not gone far before they had to stop because defendant—who had not yet been placed in a seat belt—kicked at the rear window of the patrol car and shattered the glass. Defendant was sprayed again with pepper spray in order to transfer him to a second patrol car, which then took him to the station.

The recording device from the patrol car revealed that, once in the back seat of the first patrol car, defendant asked "Why ya'll doing me like this?" and accused the officers of "slamming [him] for nothing." Officer Aranda can be heard telling defendant to relax. Defendant said his "arm is broke" (it was not). Officer Aranda told defendant he would be pepper sprayed. After defendant broke the window and was pepper-sprayed a second time, he complained about his eyes.

*Defense Evidence*

Maple has six siblings; Bolden is the eldest and has power of attorney over their mother's property, house and business. Defendant is the son of Maple's

5

niece. He has lived in the house on East 83rd Street "a long time," although Maple cannot estimate how long either in months or years. Only family members live there. Maple and her brother Willie Lloyd went to the police on January 9, 2015, after Bolden and Lloyd told her the house had been broken into, and they wanted to shut it down. Maple has a limited relationship with Bolden, and does not "do a lot of talking with" her siblings. Bolden told Maple that someone had broken into their mother's house and that it had been burglarized in August 2014, but provided no additional details. Maple did not go to the police on January 9, 2015 to report a burglary, and did not accuse defendant of being involved in a burglary at her mother's house. Rather, it was Maple's expectation that the police would go to her mother's home, remove the occupants (including defendant), and bring them to the police station in handcuffs, although she did not know what she expected to happen after that.

Defendant did not testify.

## DISCUSSION

1. *Defendant Has Not Presented a Cognizable Claim of the Violation of any Constitutional Right*

Defendant maintains the trial court violated his Sixth and Fourteenth Amendment right to testify and present a defense by deeming his parole status admissible if the prosecutor recalled Detective Horton to testify in the event defendant testified in his own defense. Defendant argues that, in making this ruling, the trial court impermissibly and effectively forced him not to testify. This assertion fails for several reasons. First, there is no constitutional question at issue. Defendant argues only that the trial court was poised to admit inadmissible evidence for an improper purpose, a claim he is precluded from raising because he

6

never testified and the purportedly inadmissible evidence in question was never admitted for *any* purpose. Second, even if defendant could assert this claim, it would fail on the merits. The court's ruling was not premised on permitting the evidence to be introduced as impeachment, but to reflect the officers' state of mind and justify the degree of force employed in defendant's detention and arrest and in anticipation of his assertion that excessive force was used. Third, assuming any error occurred, it was harmless.

a.     *Relevant Proceedings*

Before trial, in connection with its consideration of jury instructions, the court asked defense counsel if the "lawful performance" of police officers would be an issue at trial. If so, the court would need to provide the jury the portion of the pattern instruction that states that a "police officer is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone, using unreasonable force." In addition, in deciding whether an arrest was lawful, the jury had to "consider evidence of the officer's training and experience and all the circumstances known by the officer when he or she arrested the person." (See CALCRIM No. 2670(A)&(B).) When asked to explain the officers' presence at the residence on January 9, the prosecutor informed the court that Maple had come into the station that morning to report the second burglary since August 2014 at her mother's home. The detectives had located an incident report regarding the first burglary and, Maple and Lloyd had unequivocally identified defendant as their nephew and the person who broke into the house from a booking photo of him. They told Detective Horton that defendant was staying at the house, but had no right to be there and they wanted him out. The report regarding the August 2014 incident revealed that an officer who had inspected the house after Bolden's report

7

observed the damaged security bars and broken window used to gain entry. As Detective Horton was observing the residence that morning he saw defendant, whom he suspected of burglary, go inside the house and leave out the front. Defendant fiercely resisted the officers from the moment he was detained.

Over the course of several discussions between the court and counsel, defendant's trial counsel consistently informed the court that her client's defense was based on the dual theories of unlawful arrest and an excessive use of force. The court noted that defendant's right to be at the residence was not at issue given that he was not charged with burglary. Defendant's counsel was not willing to abandon the unlawful arrest defense without knowing how prosecution witnesses would testify, having earlier noted that backup officers were informed before arriving that defendant was a burglary suspect. The court agreed, stating it would instruct according to evidence elicited at trial.

After Maple testified, the court and counsel discussed whether defendant would testify. Before discussing that matter with defendant, his attorney wanted to know what impeachment evidence the prosecutor intended to use if defendant testified. The court ruled that defendant could be impeached with his 2009 and 2013 felony convictions for grand theft and residential burglary. To limit undue prejudice and confusion for jurors if defendant testified, the court determined the prior convictions would be sanitized and referred to simply as "felony theft offenses."

In the event defendant did choose to testify and was "impeached with these two prior felony theft offenses," the prosecutor requested the court's permission to recall Detective Horton to testify. This colloquy followed:

> "[PROSECUTOR]: . . . in light of the theory that they've elected to pursue, the defendant in this case is arguing that this was an unlawful arrest and unlawful detention, and that the officers used excessive force.

"The first display of force by the officers in this case was Detective Horton approaching [defendant] and ordering him to the ground at gunpoint.

"[THE COURT]: Because he's a known parolee.

"[PROSECUTOR]: In light of the fact that he has a record, I'm sure that played into it. And since that is at issue, whether or not they used excessive force, then the jury should be able to consider the fact that the officers knew that he had a criminal history.

"[THE COURT]: It actually occurred to me during the entire case being presented. I'm surprised that no one actually brought it up, because the instruction on resisting speaks to all the facts related to the officer.
    "Let's look at [CALCRIM No.] 2670 . . . .
    "If the detectives went there knowing that he was a parolee for a first degree [residential burglary], that's definitely a fact known to the officer that no doubt affects the way in which a detention, arrest, et cetera, is effectuated. [¶] 'In deciding whether the detention was lawful, consider evidence of the officer's training and experience, and all the circumstances known to the officer when he or she detained the person.
    "An unlawful arrest also has a similar provision. Consider evidence of the officer's training, experience, and all circumstances known.
    "This had occurred to me that if the officers knew this when they went — I don't know whether they did or not. I'm assuming that they did because they pulled the packet. They pulled his photo. They got some statements. They got an identification.
    "If they know who they are dealing with when they go out to a location, those facts would definitely impact the manner in which the . . . contact was conducted."

Implicitly acknowledging the court's point that an officer's knowledge of a suspect's parole status would be relevant to an officer's conduct in making an arrest, defendant's counsel argued that Detective Horton had no information that defendant was on parole when he made the arrest, and relied only on the fact that defendant was a burglary suspect. In response, the court observed:

9

"The problem is that we bifurcated the prior, and the witnesses are instructed not to bring it up in any way.

"So it is an artificial presentation for purposes of the jury not being prejudiced by hearing [defendant] . . . is on parole for a residential burglary, which is the same underlying charge.

"So what I would suggest we do is this: If [defendant] does testify, I think that's only fair because now they will know. . . . I think residential burglary is very prejudicial to [defendant]. I think we would probably have to sanitize Detective Horton's testimony, still. And this is so you can discuss with your client whether or not he wishes to testify.

"I think we would still have to sanitize it to know that [defendant] had suffered a recent felony theft offense and was on parole, because that is enough facts, but doesn't specifically name the same underlying charge."

The court noted its effort "to balance all the factors to make sure that we have a fair presentation of evidence for both sides so that [defendant] is not overly prejudiced," and asked defense counsel to explain the situation to defendant before he decided whether or not to testify. Defendant consulted with his counsel, and chose not to testify.

b.   *Defendant's Sixth Amendment Claim Fails Because He Did Not Testify*

"It is settled that 'if a defendant wishes to preserve for appeal an objection to a trial court's *in limine* ruling permitting impeachment by a prior conviction, he or she must take the witness stand and actually suffer such impeachment.' (*People v. Sims* (1993) 5 Cal.4th 405, 454; accord, *People v. Collins* (1986) 42 Cal.3d 378, 383.)" (*People v. Ayala* (2000) 23 Cal.4th 225, 272-273.) Defendant's Sixth Amendment claim is precluded because he chose not to testify and the purportedly inadmissible evidence was not admitted.

The Attorney General contends that defendant forfeited the issue on appeal by not testifying at trial. She relies on the well-established rule that "a motion to

exclude impeachment evidence is not reviewable on appeal if the defendant subsequently declines to testify. [Citations.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 731 (*Ledesma*); see also *Collins, supra,* 42 Cal.3d at pp. 384–385.) Typically, a defendant must testify to preserve an impeachment issue for review because (1) the error analysis is speculative without his or her testimony, due to the possibility that (a) the trial court may have changed its ruling in response to the actual content of defendant's testimony, or (b) the prosecutor may not have presented the impeachment evidence based on the defendant's testimony; and (2) a prejudice analysis is speculative when there is no testimony by a defendant in the record. (*Collins, supra*, at pp. 384–385.)

We reject defendant's contention that this forfeiture rule is inapplicable here because a purportedly erroneous ruling by the trial court which would have allowed Detective Horton to testify he knew defendant was on parole would have caused irreparable damage to defendant's defense that his detention and arrest were unlawful. Defendant provides no authority suggesting this creates an exception to the rule of *Ledesma* and *Collins*.

2. *Any Additional Testimony by Detective Horton Would Have Been Offered to Rebut an Excessive Force Defense, not for Impeachment*

We also reject defendant's assertion that the prosecutor's goal in potentially recalling Detective Horton was to impeach defendant, rather than to simply bolster the prosecution's case with regard to the degree of force used in the detention and arrest. We agree with respondent's characterization that the trial court's ruling on this issue was no more than a "garden variety evidentiary ruling" which did not implicate defendant's right to testify or his ability to present a defense.

11

Detective Horton may or may not have been aware of defendant's status as a parolee on January 9, 2015. However, he was told that day by Maple and her brother that their nephew had burglarized their mother's home twice, and had remained there for a very long time without permission. Maple unequivocally identified defendant from his booking photo, and demanded that police remove him from her mother's house. Defendant was arrested based on evidence provided by Maple and her siblings that he was a suspect in two burglaries. With this evidence in mind, the detectives justifiably approached defendant's detention and arrest with a heightened level of caution, care and force.

3.      *Harmless Error*

Defendant does not contend there would have been any error in introducing his felony theft convictions. Under such circumstances, any additional prejudice caused by informing jurors he was on parole in one of those cases would have been minimal. Defendant makes no argument as to why the admission of his status as a parolee under such circumstances was particularly prejudicial to his defense of unlawful arrest. Further, there was overwhelming evidence that he resisted arrest, refused to obey officers' orders, forcefully and persistently resisted officers' attempts to control him, and shattered a patrol car window. In addition, defendant offered no evidence to support his claim of excessive force. Thus, whether assessed under the state or federal standard, any error that occurred was harmless. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 [no error under California law because there is no reasonable probability there would have been a more favorable verdict had defendant testified]; *Chapman v. California* (1967) 386 U.S. 18, 25 [If it appears beyond a reasonable doubt that error complained of did not contribute to verdict, verdict will stand on appeal].)

4.      *Miscalculation of PreSentence Custody Credits*

Neither offense of which defendant was convicted was a "violent" felony. Respondent appropriately concedes that a defendant sentenced under the Three Strikes law (§ 1170.12) is entitled to presentence conduct credits pursuant to section 4019, rather than a lesser maximum amount under section 2933.1, unless his current conviction is for a violent felony. (*People v. Thomas* (1999) 21 Cal.4th 1122, 1130.) Accordingly, it is agreed that the trial court erred when it calculated defendant's presentence custody conduct credit under section 2933.1. The matter must be remanded to permit the trial court to recalculate the proper amount of presentence custody credit.

## DISPOSITION

The matter is remanded to the superior court to recalculate defendant's presentence credits under section 4019. The clerk of the superior court is directed to prepare an amended abstract of judgment reflecting the sentencing modification and forward it to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.                    MANELLA, J.

13